# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

---

|  |  |  |
|---|---|---|
| | : | |
| LIUFAU & KATE ALUSA, | : | |
| Plaintiffs, | : | No. 2:11-CV-00184-CW |
| vs. | : | |
| SALT LAKE COUNTY, *et al.*, | : | Report of Kenneth R. Wallentine |
| Defendants. | : | |
| | : | |

---

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports:

Plaintiffs' Complaint

Defendants' Answer

Salt Lake County Sheriff's Office Use of Force report INC-09-0172

Michael Brave deposition transcript

Interview transcript, Brodie Mitchell

Interview audio recording & transcript, Guy Dodge

Officer Tiana Broos deposition transcript

Unified Police Department report 2009-31206

Midvale Police Department report 09B02291

Officer Tiana Broos training records

TASER ® curriculum, V. 14.2

TASER discharge record for April 18, 2009, serial no. X00-171653

Dispatch log for incident 09B002291

Plaintiff's Supplemental Answers to Defendants' First Interrogatories, etc.

Salt Lake County Sheriff's Office Use of Force Policy

Interview with Captain Steve DeBry

Interview with Sergeant Nick Roberts


Kenneth R. Wallentine states as follows:

1.     In the instant matter, I have relied upon the documents, diagrams, pleadings, records, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications.  I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein.  Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a.     **Synopsis of reported information:**

Salt Lake County Sheriff's Deputy Tiana Broos stopped by her home at an apartment complex in Midvale for a meal break shortly after nine o'clock in the evening on April 18, 2009. At approximately 2114 hours, Deputy Broos heard loud banging and a man and a woman screaming somewhere in the apartment complex.  It sounded to her as if someone was in distress and was being seriously hurt.  At about the same time, another person called 911, reporting a fight

between several Polynesians, with loud yelling and screaming. Concerned for the person's safety, Deputy Broos stepped out of her apartment to investigate. Deputy Broos was dressed in a Sheriff's Office uniform.

Deputy Broos saw some persons looking in the area of a trash dumpster near a vinyl fence. The fence was shaking, apparently in response to someone or something impacting it. She could tell that this was the location of the persons screaming. Deputy Broos notified the police dispatcher that there was apparently a fight in progress and asked that Midvale Police Officers be sent to assist. A citizen also called police dispatch, reporting that he heard screaming and yelling and saw males fighting in the parking area. He told the dispatcher that one of the males was "extremely aggressive."

Deputy Broos then walked toward the area of the shaking fence and screaming. As she did, a woman later identified as Katie Alusa came into Deputy Broos's sight. Katie Alusa was backing up rapidly and flailing her arms, as if she was reeling from a blow or a shove and she was trying to arrest her fall. Deputy Broos described this motion as Katie Alusa "flying backwards." Deputy Broos believed that Katie Alusa was being attacked by someone.

Just then, Liufau Alusa, Katie Alusa's husband, moved from the fenced area into Deputy Broos's sight, followed by Fanueli "Jeff" Pouha ("Pouha"). Liufau Alusa ("Alusa") was shouting loudly and was stumbling as he moved. It appeared that Pouha may have been assisting Alusa walk. Alusa and Pouha were each very large men; Alusa was described as weighing well over 250 pounds and Pouha was described as weighing 400 pounds. Katie Alusa was a large woman, described as exceeding 200 pounds. Each of the three persons were much larger than Deputy Broos.

Deputy Broos asked what was happening.  Alusa saw her, shouted, "no fucking cops," and moved rapidly toward Deputy Broos.  This frightened Deputy Broos.  Pouha grabbed Alusa and restrained him, speaking to him and trying to calm him.  Deputy Broos tried to calm these three persons, intending to investigate the nature of the conflict.  The Alusas and Pouha ignored Deputy Broos, walking past her as she tried to converse with them.  The Alusas walked through the open door of an apartment.  Deputy Broos commanded them to not shut the door.  Katie Alusa looked at her and slammed the door.  Deputy Broos knocked.  No one responded.

Deputy Broos spoke to Pouha, who refused to provide any information other than his own identity.  Deputy Broos could hear screaming and loud banging noises, sounding like objects were being broken, coming from the apartment that the Alusas had just entered.  Deputy Broos believed that the voices screaming were two of the same voices that she had heard screaming in the area of the dumpster.  She heard a door slam and saw Liufau Alusa coming down the stairs to the parking area.

Brodie Mitchell, Deputy Broos's domestic partner, was in the parking lot watching the commotion.  Alusa looked at Mitchell, squatted, flexed his muscles and charged toward Mitchell.  Alusa was moving rapidly and swinging a clenched fist, yelling something that was unintelligible to Deputy Broos.  Deputy Broos perceived that Alusa was intoxicated.  She noted that he was stumbling, spoke with slurred speech and had apparently uncoordinated, jerky movements as he continued to swing at Mitchell while Mitchell backed away.

Deputy Broos ordered Alusa to stop charging at Mitchell.  She warned Alusa several times that she would deploy a TASER® device if he did not stop.  Alusa did not heed the warnings and continued to swing at and charge toward Mitchell.  Deputy Broos fired a TASER at

Alusa, striking him in the right back and buttock. Alusa fell to the ground, possibly due to his intoxication or possibly due to the effect of the TASER.

Once Alusa was on the ground, Deputy Broos immediately ordered him to place his hands behind his back. Alusa did not comply, though he was apparently able to volitionally move his arms and hands. He moved his hands toward his shoulders as a person would likely do as part of pushing up off the ground. Deputy Broos continued the TASER energy discharge and repeated her commands. Alusa reached one hand behind his back with a grabbing motion, grasping at his clothing in an apparent effort to dislodge the TASER probes. Deputy Broos energized the TASER a second time to prevent Alusa from pulling the wires or probes and standing up. She repeated her commands to him to place his hands in a submission position. He did not.

Pouha yelled at Liufau Alusa, telling him to "listen to [Deputy Broos], listen to her." Alusa persisted in non-compliance and persisted in apparent attempts to free himself from the TASER wires or probes. At that point, Katie Alusa rapidly approached Deputy Broos from the rear, shouting at her to end the TASER discharge, saying "fucking stop." Deputy Broos ordered both Pouha and Katie Alusa to step back.

At about this point, Deputy Broos once again stopped the TASER discharge. She repeated over and over her commands to Liufau Alusa to put his hands behind his back. He continued to grab at the TASER wires. Deputy Broos re-energized the TASER. Two Midvale Police Officers then arrived.

One of the Midvale Police Officers, Guy Dodge, saw that the on-lookers appeared to be agitated against Deputy Broos. Concerned for his own safety, he commanded Katie Alusa to back away. He then approached Alusa and ordered him to cross his ankles, put his hands behind

his back and stop resisting. Alusa did not. Alusa started to push up, turned his head and looked at Officer Dodge. Alusa reached toward a front pocket with his left hand. Officer Dodge immediately became even more concerned for his safety.

At that moment, Deputy Broos again energized the TASER as Officer Dodge gave commands to Alusa. Alusa pulled his hands out as if to move them to his lower back. Officer Dodge grabbed Alusa's hands and applied handcuffs. Officer Dodge remained with Alusa until medical personnel came to check him. Following a field examination by medical personnel, Alusa was taken to a hospital for further evaluation and treatment.

b. **The force used to control Liufau Alusa was justified by his actions and was consistent with the actions of reasonable well-trained officers and was consistent with generally accepted policies, practices and training.**

1. It would have been evident to a reasonable officer that Alusa, Katie Alusa and Pouha were involved in some form of altercation. After seeing Katie Alusa "fly backwards" from an apparent blow or a strong shove, a reasonable officer would have concluded that it was likely that the nature of the altercation involved domestic violence. Officers are instructed in basic academy training about domestic violence and the duty to affirmatively intervene. Officers are taught that they have a unique statutory mandate under Utah law to investigate when there is a reasonable likelihood that domestic violence is occurring or has occurred. Even if there had been no domestic relationship, Deputy Broos had an obligation to intervene and protect Katie Alusa.

2.     Deputy Broos saw Alusa charge toward Katie Alusa.  Deputy Broos had

reasonable suspicion to detain Alusa and probable cause to arrest Alusa.  Alusa

ultimately acknowledged his guilt in interfering with a lawful arrest and

intoxication through guilty pleas.  Deputy Broos observed what she interpreted as

domestic violence and she investigated.  She believed that someone was being

seriously injured and she was concerned for that person's safety.  Her investigation

was consistent with the actions of a reasonable well-trained deputy.

3.     Just as Deputy Broos tried to engage Alusa and Katie Alusa in a conversation,

Alusa saw her, shouted, "no fucking cops," and charged at her.  At that point,

Deputy Broos was not only concerned about the domestic violence, but also an

attack by a man who was angry and violent and much larger than her.  She also

needed to pay attention to the others around her, particularly to Katie Alusa and

Pouha.  Deputies are trained to recognize that anger and violence directed at

participants in a brawl, and particularly in domestic violence incidents, may be

instantly redirected at the responding officers.  Pouha was struggling to keep the

intoxicated Alusa under control.  Pouha, Alusa and Katie Alusa were each agitated

and Deputy Broos recognized the significant danger inherent in the situation.

4.     Alusa appeared to be impaired.  He was shouting loudly and was stumbling as he

moved, walking with Pouha's apparent assistance.  Alusa later acknowledged that

he was, in fact, intoxicated.  A reasonable well-trained deputy would have called

for assistance (as Deputy Broos did) and further investigated Alusa's intoxication,

particularly in light of the facts supporting a belief that he had been involved in a domestic violence incident.

5.  Alusa ignored Deputy Broos's attempt to investigate. He walked away, despite his lawful obligation to submit to Deputy Broos's investigation. He and Katie Alusa went into an apartment. Deputy Broos lawfully commanded them to not shut the door. Katie Alusa slammed the door shut. Deputy Broos knocked without response. The Alusas' refusal to cooperate did not negate Deputy Broos's obligation to continue her investigation. She heard screaming and banging, sounds consistent with further domestic violence. She renewed her request for backup assistance.

6.  When Deputy Broos saw Alusa come out of the apartment and come down the stairs to the parking area, Deputy Broos still had an obligation to gather information and investigate what she had seen and heard. Deputy Broos was faced with circumstances that were tense, uncertain and rapidly evolving before her. Before she could continue her investigation, Deputy Broos saw Alusa look at Brodie Mitchell, squat, flex his muscles (a common signal of impending assault) and charge quickly at Mitchell with a clenched fist, yelling something. A reasonable well-trained deputy would have recognized the need for rapid intervention to thwart Alusa's assault against Mitchell.

7.  Deputy Broos ordered Alusa to stop. She warned Alusa several times that she would deploy a TASER device if he did not stop. Alusa either did not comprehend Deputy Broos's warnings, perhaps due to his level of intoxication, or

he ignored her warnings. He continued to swing at and charge at Mitchell. Deputy Broos fired her TASER at Alusa, striking him in the right back and buttock. Alusa fell to the ground, possibly due to his intoxication or possibly due to the effect of the TASER. A reasonable well-trained officer would have used force to stop Alusa's assault against Mitchell. A reasonable deputy would recognize the urgency of controlling Alusa and stopping him from assaulting Mitchell. A reasonable well-trained officer who was trained in the use of a TASER and equipped with a TASER would have recognized that the TASER device was a reasonable force option in stopping the assault.

c.   **The use of the Advanced TASER® X26 device to control Liufau Alusa was reasonable based on the circumstances presented to Deputy Broos and was consistent with generally accepted best practices for police at the time of the incident. The risk of injury posed by the application of the TASER X26 device was minimal and was reasonable in consideration of the significant interest in controlling and securing Liufau Alusa.**

1.   Use of an electronic control device, such as the Advanced TASER X26® device that was used by Deputy Broos, is often indicated in cases of a non-compliant subject who demonstrates a willingness to hurt himself or others. Electronic control devices may provide, under appropriate circumstances, reasonable alternatives to force options that present other risks in the particular circumstances. None of the known contraindications for the TASER X26, such as an obvious pregnancy, notably low body mass, or a flammable environment, were

presented by Liufau Alusa. Other than probable intoxication, Alusa did not appear to be physiologically impaired in any way; to the contrary, he appeared to be very physically strong and powerful as he beat the fence and dumpster. Deployment of the TASER X26 was a viable and reasonable option to assist in controlling Alusa .

2.      Unlike most other force options, the TASER electronic control device does not depend exclusively on pain to achieve compliance, although the subject generally reports pain. The pain and the subject's unfamiliarity with the sensation may distract the subject. The TASER electronic control device relies on loss of neuromuscular control and the ability to perform coordinated action. When discharged from a distance, the TASER X26 uses compressed nitrogen gas to propel two probes which are attached to the X26 by thin wires measuring approximately 127 microns, thinner than some human hair. If both probes make contact with a person, closing the electrical circuit, the X26 delivers an electric current through the wires into the person. The TASER electronic control device is designed to override the person's central nervous system and override the person's volitional neuromuscular control. The X26 delivers short, shaped electrical pulses lasting 100 microseconds, delivering 19 pulses per second for the first two seconds, and then dropping to 15 pulses per second while discharging. Each operation of the X26 delivers approximately 400 volts average (1,200 peak volts), contrasted to as much as 100,000 volts experienced in a strong static electricity shock. The TASER discharge produces a current of 0.00021 amperes into the person's body over the duration of the TASER discharge, or approximately

21/100,000ths of the same amperage of the current required to light a single small Christmas tree bulb. The X26 defaults to a five second discharge for each discharge, although the device operator can manually stop or manually extend the cycle.

3.     Deputies are taught that the general safety of the TASER electronic control device has been well-documented in dozens of peer-reviewed medical and safety studies, as well as the deployment history in numerous public safety agencies. Summaries and conclusions of many of these studies were presented in the TASER training that Deputy Broos attended. The United States Department of Justice and the United States Department of Defense are among the many government institutions and universities' studies whose independent, peer-reviewed research and analysis has supported the general safety of electronic control devices. Deputies are taught that there have been well-over 2,100,000 TASER applications on humans. During a very few of those applications, persons have been injured. On very rare occasions, persons have died after grappling and struggling with the police officers who deployed the TASER to assist in capturing and controlling them. However, deputies are also taught that there has never been a death that has been scientifically demonstrated to have been caused by the application of the TASER device.

4.     The TASER electronic control device has a strong history of significantly reducing injuries in law enforcement force applications and in preventing the necessity of more injurious force options, including deadly force. For example, through my

work on behalf of the City of Phoenix Police Department and the Maricopa County Sheriff's Office, I am personally familiar with a 67% decrease in suspect injuries and a 54% reduction in deadly force uses in a single year. I have studied research that demonstrates that the use of an electronic control device is far less injurious than other non-lethal force options. In the course of my teaching and research, I have studied the injury rates and use of force tool effectiveness rates of over a dozen major police departments using electronic control devices. Each one reported a reduction in injuries. As electronic control device use increased in departments, the use of more injurious options, such as impact rounds, baton strikes, chemical sprays, dog bites and take downs, decreased and corresponding injury rates decreased. Deputies are taught that the TASER device is a viable alternative to other force options that is both safe and is likely to reduce injuries to officers and the persons that the officers are attempting to control.

5.      A consequence of a discharge of an electronic control device may be that the subject falls to the ground. However, significant injuries from such falls are very unlikely. An epidemiological study conducted by physician researchers at Wake Forest University, Virginia Commonwealth University, Louisiana State University and the University of Nevada, and published by the American College of Emergency Physicians, of approximately 1,000 cases of individuals taken into custody following the use of an electronic control device showed a significant injury rate of 0.5% and a head injury rate (sufficiently serious to require medical treatment) of 0.2%. The large majority of falls, 99.7% of the cases, resulted in no

injury or only in minor abrasions or contusions, as was the apparently the case with Alusa. This extremely low rate of significant injuries is consistent with my observation of electronic control device use in the field and in my studies of law enforcement agencies' use of force reports.

6.    There was significant size disparity between Deputy Broos and Alusa. Even assuming that a deputy accurately perceives and assesses a significant size disparity, there are a number of other threat factors that should be considered. A reasonable deputy might or might not perceive a size disparity in a situation of momentary observation of an apparently well-muscled, quick-moving person. Very often, deputies must subconsciously perceive and process these factors in the split-second decision to address a tense, uncertain and rapidly evolving situation. Deputies are taught these factors; some may be common sense. Threat factors that a deputy should consider go beyond consideration of whether the suspect is armed or assaultive. Factors to consider when dealing with a drug or alcohol impaired or mentally disturbed person include such factors as: the person's known or reported history, drug use, the sex/age/body size/perceived strength disparity between the officer and person, the available weapons, verbal threats, non-compliance with the officers' commands, the person's appearance and demeanor, muscle-clenching or jerky muscle movements, whether the person displays an aggressive or combat stance or gait, whether the person has removed jewelry and/or clothing, the person rapidly scanning the area (or holding a "1,000 yard stare"), geographical and terrain factors (rural or urban area, unstable, slick, rocky or steep ground), the

number of other deputies immediately present, if any, crowd/bystander conditions, the available force tools, the ability to obtain sufficient and immediate back-up and physical exhaustion. This is not an exclusive list.

7.      Deputy Broos was required to make a split-second judgment about how best to control Alusa and keep Alusa from assaulting Mitchell, Katie Alusa or some other person. Deputy Broos also was forced to divide her attention because Katie Alusa and others who were hostile toward Deputy Broos were positioned at the periphery of Deputy Broos's vision. Deputy Broos had been trained in the prescribed circumstances for TASER deployment and recognized, as would any similarly-trained and situated reasonable officer, that the TASER was a reasonable device to assist in rapidly controlling Alusa. Deputy Broos's perceptions of the risks that Alusa presented to himself, to her and to others at the scene, including Mitchell and Katie Alusa, were reasonable perceptions that any reasonable deputy would likely also perceive. Deputy Broos's training taught her that the foreseeable risks of injuries to Alusa resulting from deployment of the TASER to attempt neuromuscular incapacitation and the foreseeable secondary risks of deployment of the TASER were minimal. Deputy Broos reasonably concluded that deploying the TASER was a reasonable option, consistent with generally-accepted police best practices.

8.      Deputies completing law enforcement training in Utah are taught that prone control, colloquially known as ground control, promises maximum control for

persons to be taken into custody. Alusa did not comply with verbal efforts to place his hands in a position for submission to handcuffing and control.

9.    Police officers, deputy sheriffs, troopers and other law enforcement officers are trained at the police academies across the nation, and specifically in all Utah police academies, that every physical confrontation where a deputy and a suspect grapple or the deputy uses empty hands control tactics at a close distance (which is *always* the case with empty hands tactics) involves at least one loaded gun and the possibility of being fatally shot. In the 30 years since I began my law enforcement career, I cannot recall a single year where there were not multiple deputies and officers shot with their own weapons that had been taken away in a struggle with a suspect. Most years, deputies and officers killed during response to domestic disturbance calls is at the top or toward the top of the list of circumstances in which officers are shot, again some with their own weapons. I am personally familiar with such shootings. This is one of the training points that is frequently repeated in initial academy training and in-service training. Deputies are taught that maintaining distance whenever possible is a prime safety consideration. Keeping an intoxicated, disturbed or assaultive person away from the deputy's firearm is a core principle that is frequently reinforced in training. Any reasonable deputy would have recognized that Alusa presented a threat of grappling for the deputy's weapon. The almost certain result would have been one or more shooting deaths. Using a TASER device to halt a charge or assault against a

deputy that could result in a struggle for the deputy's gun is a method commonly taught to deputies.

10. Alusa was actively resisting Deputy Broos's efforts to stop him from assaulting Mitchell. Alusa was physically evasive movements, running away from Deputy Broos and ignoring her commands to stop, physically signaling his intention to prevent being taken into custody. When Deputy Broos fired the TASER, the probes struck Alusa in the right back and right buttock. At least some neuromuscular incapacitation might have resulted, although Alusa's obesity may well have substantially reduced any such effect and there does not appear to have been a significant probe spread. His level of intoxication would very likely have minimized his sensation of the pain reported by most persons experiencing a TASER discharge. Alusa fell to the ground. It is equally plausible that he fell because he was very intoxicated, as evidenced by his earlier stumbling and jerky movements and Pouha's attempts to assist Alusa walk.

11. Once Alusa was on the ground, Deputy Broos immediately ordered him to place his hands behind his back. Alusa did not. He refused to assume a position that would allow for his arrest and handcuffing. Instead, he moved his hands toward his shoulders as if he intended to push up off the ground. Alusa continued to pose a threat to Mitchell and to Deputy Broos as long as he refused to comply and tried to stand up.

12. Deputy Broos continued the TASER energy discharge and repeated her commands to Alusa. The first TASER energy cycle lasted for 50 seconds, during which Alusa

continued to act in a way that a deputy could reasonably interpret as aggressive and non-compliant behavior and an attempt to defeat restraint. Deputy Broos released the TASER trigger and repeated commands to Alusa. Deputies are taught that the TASER device delivers energy for a default period of five seconds when the trigger is depressed and released and the device is not manually powered off. This default period is designed to provide a window of opportunity during which a deputy may apply handcuffs or otherwise restrain a suspect. However, when neuromuscular incapacitation does not result from the energy cycle, there is generally no window of opportunity to restrain a suspect.

13. There are occasional circumstances where the subject continues actively resisting arrest and does not desist in efforts to assault an officer or other victim and a longer energy cycle prevents the subject from accomplishing an attack or escape. In such cases, deputies are instructed to consider continued application of the electronic control device as a means of preventing an effective assault or escape by the suspect. Although deputies are taught to limit the energy discharge cycle and to try to handcuff during the discharge cycle if the suspect appears to be experiencing neuromuscular incapacitation, deputies are often also taught that prolonged energy discharge–though undesirable–does not pose a significant risk of injury to the suspect. Deputies are also taught that prolonged energy discharges are more particularly contraindicated when the probes have impacted on the suspect's chest and bridge the diaphragm, especially in a person who has visibly little body mass (neither circumstance being present with Alusa). I am personally

familiar with persons who have voluntarily received multiple 45 second continuous discharges and have been medically examined with no report of respiratory, cardiac or other physical dysfunctions.

14. Alusa reached one hand behind his back with a grabbing motion, grasping at his clothing in an apparent effort to dislodge the TASER wires and/or probes, again signaling his intention to halt his resistence and prevent being taken into custody. Deputy Broos energized the TASER a second time to prevent Alusa from pulling the wires or probes and standing up. Alusa remained non-compliant and combative, and Deputy Broos sought to safely subdue him as he continued to resist and not comply with Deputy Broos's orders. The second TASER energy cycle lasted for 51 seconds. At any point during each of the TASER energy cycles, Alusa could have chosen to stop his resistance and to stop grasping at the TASER wires or probes.

15. Alusa persisted in non-compliance, actively resisting and continuing apparent attempts to free himself from the TASER wires and/or probes. At that point, Katie Alusa rapidly approached Deputy Broos from the rear and shouting at her to "fucking stop," distracting Deputy Broos from her efforts to gain compliance from Alusa. This distraction posed a danger to Deputy Broos, as it would any deputy, because she was required to divert her attention from an actively resisting suspect. Deputy Broos ordered both Pouha, who was shouting at Alusa to cooperate, and Katie Alusa to step back.

16.     When the second discharge of the TASER was similarly ineffective in gaining compliance from Alusa, Deputy Broos energized the TASER a third time for 17 seconds. At approximately this point, Midvale City Police Officers Guy Dodge and Nick Warrick arrived to assist. Officer Dodge immediately recognized the precarious situation facing Deputy Broos. He commanded Katie Alusa to back away.

17.     Officer Dodge cautiously approached Alusa. He heard Deputy Broos continue to command Alusa to stop resisting and place his hands at his back. Officer Dodge noted that Alusa did not heed the repeated commands. Alusa started to push off the ground. He turned his head and looked at Officer Dodge. Alusa then reached toward a front pocket with his left hand. A reasonable well-trained officer would recognize such a move as an extreme danger sign, consistent with a person reaching for a weapon, and more so because of the application of the TASER and repeated commands. A suspect reaching toward a pocket or waistband during the application of an electronic control device energy cycle would lead a reasonable officer to believe that the suspect was very determined to reach for a weapon that could injure or kill the officer.

18.     Deputy Broos again energized the TASER as Officer Dodge gave more commands to Alusa. The fourth and fifth TASER discharges lasted four and two seconds, respectively. Deputy Broos could now more safely minimize the application of energy discharges because of the backup officers. When she reasonably could limit the discharges, she did so. Alusa pulled his hands out as if to move them to his

lower back. Officer Dodge grabbed Alusa's hands and applied handcuffs. Medical personnel came to the scene and provided care.

19.    The first three TASER discharges each exceeded the automated five-second cycle that results from a single trigger pull on a TASER X26 device. The TASER X26 is designed to continue an energy discharge when the trigger is held back. One of the purposes in allowing continuous discharge is to address situations such as that presented by Alusa.

20.    A reasonable well-trained law enforcement officer would have perceived just what Deputy Broos perceived. She was significantly outmatched by Alusa's size. That great disparity was exacerbated by Alusa's apparent intoxication, demonstrated violence and continued aggression. Compounding the danger was Katie Alusa's aggressive distraction and presence, as well as Pouha's overwhelming size and affinity with Alusa.

21.    Alusa had effective control over the duration of each TASER energy cycle by exercising his choice to comply and submit to arrest or to continue to try to get up and continue his criminal acts.

22.    Deputy Broos made a reasonable force option choice and she deployed it reasonably. It is readily apparent that the TASER was not optimally effective in fully controlling Alusa. Alusa did not respond to Deputy Broos's commands, to Pouha's pleading to cooperate with the arrest or to Officer Dodge's commands. Continued application of energy during several cycles appears to be the only thing that hindered Alusa's efforts to get up and continue his assault against Mitchell and

possible further assaults, and ultimately to prevent him from reaching into his pocket as any reasonable officer would do.

d. **The Salt Lake County Sheriff's Office (now known as the Unified Police Department) properly trained Deputy Broos in the use of the Advanced TASER X26 device and adopted policies for its use that were consistent with generally accepted best practices for law enforcement agencies at the time of the incident.**

1. Deputy Broos was certified to use the TASER X26 at the time of this incident; she successfully completed the TASER X26 training less than two weeks prior to this incident. She was trained to generally-accepted professional training standards and was required to complete the examination prescribed by TASER International and that is in use in thousands of law enforcement agencies in the United States, Canada, several other nations and in the United States military services. She had received an exposure to TASER X26 probes.

2. Deputy Broos successfully completed basic police academy training and had maintained the requisite in-service training hours (no fewer than 40 hours per year, much higher than the number of hours required for most licensed professionals) each year. She was trained to the level of a reasonable police officer working in the state of Utah.

3. Deputy Broos was acting under a Salt Lake County Sheriff's Office policy that was harmonious with recommended best practices and was consistent with prevailing TASER use policies in force at the time, and followed by many other police departments, military services, sheriffs' offices and state law enforcement

agencies in the United States. The policy provisions included advisement to consider other force options when controlling a person, to consider the force offered by the person and whether the officer or others could suffer injury from the person's actions, and to consider the size and demeanor of the person to be controlled and the likelihood of injury from some physical force. The Salt Lake County Sheriff's Office provided a copy of this policy to Deputy Broos and trained her in its provisions. That training is consistent with police best practices.

4. The training provided to Deputy Broos by the Salt Lake County Sheriff's Office that was in addition to the state-prescribed use of force training included scenario-based training that integrated a number of force tools and options and included practical and written testing on various force options. The training included scenarios requiring force option decision making. Such training is consistent with police best practices and exceeds use of force training required by the State of Utah Peace Officer Standards and Training.

e. **The Salt Lake County Sheriff's Office (now known as the Unified Police Department) properly supervised Deputy Broos's use of the Advanced TASER X26 device.**

1. Sergeant John Barker responded to the scene in his capacity as a first line supervisor. He ensured that important steps, such as calling for medical personnel, had been performed and he assisted Katie Alusa with information about where Alusa would be taken for medical evaluation. Supervisory response to a use of

force is not mandatory, but is a good practice for a law enforcement agency. Sergeant Barker acted consistent with police best practices.

2.  Post-incident analysis and policy review is important for a well-supervised law enforcement agency. The Salt Lake County Sheriff's Office had procedures in place for supervisory review of all TASER deployments. Those procedures were followed and a review of Deputy Broos's use of force resulted. Captain DeBry conducted an administrative review of this incident, documenting the facts of the incident, evaluating compliance with agency policy and state law. He directed that additional reports be completed by all deputies at the scene and he reviewed the report from the Midvale Police Department. Captain DeBry's supervisory practices demonstrate his and the Salt Lake County Sheriff's Office's commitment to accountability and continuous improvement.

3.  Captain DeBry's administrative review of this incident was consistent with police best practices. His review was independent and included review of available reports and documents. When he noted that some of the deputies without substantial involvement in the situation had not completed reports documenting their limited involvement, he caused those reports to be submitted. Doing so preserved additional available information and demonstrated Captain DeBry's commitment to a thorough and fair review of the incident.

4.  Training and competency testing is often a component of proper supervision for certain police duties, including use of force. In my exploration of the use of force and force options training completed by Deputy Broos, I noted that the training

was supervised by proficient and certified instructors who used training methods that are consistent with police best practices. The supervision of the training was enhanced by the previously-mentioned competency testing that was successfully completed by Deputy Broos.

f. **The Salt Lake County Sheriff's Office (now known as the Unified Police Department) followed generally accepted best hiring practices for law enforcement agencies when hiring Deputy Broos.**

1. The Salt Lake County Sheriff's Office followed a fairly standard system of background investigation. This system is commonly used by Utah law enforcement agencies. The background investigation included an online self-report evaluation that is administered by a nationally-known firm. This is intended to highlight an applicant's history and note areas where particular matters should be further investigated. The background investigation also included other standard steps, such as personal contact with references, review of employment history and contact with former employers, credit and financial status report, driver license history, criminal history and personal examination of any reported incidents.

2. The Salt Lake County Sheriff's Office also required Deputy Broos to submit to a polygraph examination. Though relatively common, a polygraph examination is often omitted in many police background investigations.

3. One particular strength available to the background investigator assigned to Deputy Broos's application was her prior experience with the Draper City Police Department. The investigator was able to speak to a known and highly trusted

source who was uniquely qualified to speak to Deputy Broos's suitability as a law enforcement officer. Deputy Broos was highly rated by the Draper City Police Department.

4.     The background investigation conducted for Deputy Broos met generally accepted best hiring practices for law enforcement agencies.

2.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.     **My qualifications as an expert in this subject matter include the following:** I am a law enforcement officer in the State of Utah. My primary employment is for the Utah Attorney General, where I serve as the Chief of Law Enforcement. I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety. I was certified as a law enforcement officer in the State of Utah in 1982. My duties include direct supervision and command of various investigative units and agents throughout the State of Utah, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians, as well as approximately one dozen part-time peace officer employees. I command the State of Utah Child Abduction Response Team. I command

the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst ®. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-

Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety and am responsible for course design and curriculum selection for Criminal Procedure.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I occasionally perform in-custody death investigations and officer-

involved shooting death investigations for agencies which may lack the requisite expertise. I am

the author of a number of model policies for law enforcement agencies, and have provided policy

drafting and policy review services for several agencies, including policy drafting responsibility for

large law enforcement agencies. I have served as a contract consultant to the United States

Department of Justice, assigned to provide technical assistance and management consulting to

various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities.

Professional activities pertinent to law enforcement include serving as a Past-President of the

Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member

of the International Association of Law Enforcement Educators and Trainers Association,

member of the International Association of Chiefs of Police and the Utah Chiefs of Police

Association, member of the National Tactical Officers Association, member of the International

Association of Law Enforcement Firearms Instructors, member of the International Association of

Directors of Law Enforcement Standards and Training, member of the International Law

Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace

Officers Association, member of the United States Police Canine Association, past member of the

board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-

Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a

gubernatorial appointee to the Council on Peace Officer Standards and Training. I currently

frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and

Training. I am a former member of the Scientific Working Group on Dog and Orthogonal

Detector Guidelines, a national scientific best practices organization sponsored by the Federal

Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police.

8.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies. In that capacity, I have assisted in the drafting and review of use of force, police service dog and electronic control device policies in current use by more than 1,100 police agencies and correctional facilities in the United States.

10.     **My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. It includes an extensive discussion of use of force by police

officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk*

*Management*, The Municipal Lawyer, July 2002; and a variety of columns addressing law enforcement issues and published by PoliceOne.com.  I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005).  This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.     **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness.  I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful imprisonment.  *Garcia v. Sacramento City, et al.,* No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012.  Deposition testimony given on behalf of the defendants.  Subject matter: police canines. *Cavanaugh v. Woods Cross City, et al.,* No. 1:08CV00032, United States District Court of Utah,

Central Division, 2011.  Trial testimony given on behalf of the defendants.  Subject matter: excessive force and TASER use.  *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission, 2011. Trial testimony given on behalf of Respondent.  Subject matter: police canines and excessive use of force.  *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR  United States District Court of Iowa, 2011.  Trial testimony given on behalf of defendant.  Subject matter: police canines.  *Cardall v. Thompson, et al.* Case No. 2:10-CV-00305-CW, United States District Court of Utah, Central Division, 2011.  Deposition testimony given on behalf of the defendants.  Subject matter: excessive force, wrongful death.  *Krause & Martin v. Manalapan Township*, Case No. 3:09-CV-0287, United States District Court of New Jersey, 2010. Deposition testimony given on behalf of defendant.  Subject matter: police canines.  *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010.  Trial testimony given on behalf of defendants.  Subject matter: excessive force.  *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010.  Deposition testimony given on behalf of the defendants.  Subject matter: excessive force and propriety of an arrest. *United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010.  Trial testimony given on behalf of the plaintiff.  Subject matter: search and seizure. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010.  Trial testimony given on behalf of the plaintiff.  Subject matter: search and seizure.  *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009.  Trial testimony given on behalf of the plaintiff.  Subject matter: search and seizure.  *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009.  Deposition testimony given on behalf of the defendants.  Subject

matter: improper execution of search warrant, negligent investigation. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper search and excessive force. *Becker v. Bateman*, Case No. 2:07-CV-311 PGC, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive force. *Salva v. Kansas City Board of Police Commissioners*, Case No. 07-CV00194-JTM, United States District Court of Missouri, Western Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Turnbow v. Ogden City et al.*, Case No. 1:07-CV-114, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct. *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive force.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony,

consideration of any report submitted by plaintiff's experts, and further investigation. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

The force used to control Alusa and thwart his assault on Mitchell was consistent with the actions of reasonable well-trained officers and was consistent with generally accepted police policies, practices and training. Deputy Broos properly warned Alusa prior to deploying the TASER device and gave Alusa sufficient opportunity to comply with lawful commands. Deputy Broos used proper techniques to control Alusa and she used those techniques properly. She was properly trained to use the force applied in this situation.

Deputy Broos's force responses were appropriate for Alusa's violent combative and assaultive behavior. Deputy Broos was operating under a Salt Lake County Sheriff's Office policy that is consistent with many similar policies in use in many law enforcement agencies throughout the nation and in the state of Utah. That policy properly governs police use of force and provides reasonable guidance to Sheriff's deputies.

The Salt Lake County Sheriff's Office properly trained Deputy Broos, using training methods that are consistent with police best practices. The Sheriff's Office properly supervised

Deputy Broos. The post-incident force review in this case meets generally-accepted police standards and was consistent with police best practices. The Sheriff's Office followed hiring practices that are consistent with those in use in many law enforcement agencies throughout the nation and in the state of Utah and the office made a reasonable decision to hire Deputy Broos.

Kenneth R. Wallentine
May 22, 2012

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123