```
 1        Q.    So your attorney wasn't present?
 2        A.    Not specifically then, no.
 3        Q.    Okay.  So I want to know why you read the
 4   operator's manual and what you'd -- why you needed --
 5              MR. WAYMENT:  George, we're not going to --
 6              MR. WADDOUPS:  You weren't even present.
 7              MR. WAYMENT:  It's -- the answer to that
 8   question invades the privilege.  She's been instructed
 9   not to answer that.  If you want to change --
10              MR. WADDOUPS:  If you're not present, you
11   cannot assert the privilege.
12              MR. WAYMENT:  I'm not going to argue the
13   privilege -- I'm not going to argue with you about it.
14              MR. WADDOUPS:  Okay.
15        Q.    What other information did you review?
16        A.    I reviewed -- briefly reviewed the -- the
17   Use of Force policy.
18        Q.    Why did you do that?
19        A.    To refresh my memory.
20        Q.    You forgot what the policy was?
21              MR. WAYMENT:  It's argumentative.  Go
22   ahead.
23        A.    No, I was just trying to recall the
24   verbiage.
25        Q.    So you could use the right verbiage in your
```

```
 1        A.    It appears so, yes.
 2        Q.    Between February 25th, 2008, and April 6th,
 3  2009, do you -- did you deploy your taser against
 4  somebody in your line of duty?
 5        A.    Yes.
 6        Q.    Do you remember how many times?
 7        A.    How many times I deployed it?
 8        Q.    Yes.
 9        A.    One subject.
10        Q.    Okay.  After April 6th, 2009, between that
11  date and April 18th, 2009, did you deploy your taser
12  against another person besides Mr. Alusa?
13        A.    No.
14        Q.    Tell me, when you get on your shift, tell me
15  what you're supposed to do regarding your taser.
16        A.    I'm supposed to do a spark test.
17        Q.    Did you do it on this occasion?
18        A.    I couldn't tell you.  Sometimes I do,
19  sometimes I don't.
20        Q.    I'm just wondering why it didn't show up in
21  the download.
22        A.    If it didn't show up in the download, it's
23  possible that it didn't or they targeted a specific time
24  frame.
25        Q.    Or maybe you didn't do it?
```

```
 1        A.    We're not friends with our dispatchers.
 2        Q.    Okay.  Have you gone back and pulled the
 3   dispatch recording?
 4        A.    I never have, no.
 5        Q.    Do you know what time you called that in?
 6        A.    I do not.
 7        Q.    Then what did you do?
 8        A.    Then I walked over to this -- started
 9   walking this the direction.
10        Q.    Okay.  So when you started walking, before
11   you started walking, when you left the house, where was
12   Brody?
13        A.    I don't recall.  I wasn't keeping track of
14   him.
15        Q.    Did you tell him to stay inside?
16        A.    No.  He's an adult.  He can come out if he
17   would like.
18        Q.    Well, wasn't it a department policy if
19   you're going to go investigate you don't have your
20   live-in boyfriend come with you to investigate with you?
21        A.    We weren't on a ride along.
22        Q.    No, I didn't ask you that.  I'm saying,
23   isn't it department policy not to invite your -- or allow
24   your boyfriend to come and investigate a fight situation
25   with you, if that's what you're investigating?
```

Q.      Have you seen -- have you been on the
computer to look at the domestic policy recently?
        A.      No.
        Q.      As you sit here today, you don't really
recall it?
        A.      Not off the top of my head.
        Q.      Why don't we go ahead and attach it.  I
thought I was going to be organized and have it right
here.  Here it is.  Let's mark that as Exhibit 6.
                **(Exhibit No. 6 was marked.)**
        Q.      And since you haven't -- since you haven't
reviewed this policy recently, it's a five page document.
I'm not going to ask you any questions on it today,
that's Exhibit 6.
                MR. WAYMENT:  Can I just see the exhibit?
                MR. WADDOUPS:  That's the document you sent
to us.
                MR. WAYMENT:  Is that the one we sent to
you?
                MR. WADDOUPS:  Yes.
                MR. WAYMENT:  And, for the record, this
would have been her previous employment with the
Sheriff's Office.
                MR. WADDOUPS:  Right.
                MR. WAYMENT:  Just -- not her current

```
 1  criminal code?
 2            MR. WADDOUPS:  I don't know.  She said he
 3  committed assault on a police officer.  I'm just asking
 4  if she knows the elements.
 5       A.   It would be the same elements as assault,
 6  except for the fact that I was a police officer in
 7  uniform, easily identified.
 8       Q.   Okay.  What are those elements under the
 9  code?
10       A.   The fact that somebody places somebody else
11  in fear of their safety, and that person takes some sort
12  of step towards making them feel that they're in imminent
13  danger.
14       Q.   Is that what you believe subjectively or is
15  that objectively?
16       A.   I don't know the exact verbiage, I
17  apologize.  If you give me a code book, I could read
18  it.
19       Q.   Okay.  So you didn't arrest him, and you
20  didn't shoot him or tase him at that point, did you?
21       A.   At that point, no.  My intention was not to
22  get into a physical altercation.
23       Q.   Okay.  So when he followed -- he didn't do
24  anything to you or make any motions to you when he went
25  up the stairs.  You already testified to that.  And you
```

155

Kristin Marchant, RPR
DepomaxMerit Litigation Services


```
 1    we can --
 2                THE WITNESS:  Oh, I'm sorry.
 3        Q.   And "L" represents the general area where
 4    you think he fell?
 5        A.   Yes, in this area.
 6        Q.   Where was Brody Mitchell when Mr. Alusa
 7    fell, after you tased him?
 8        A.   I don't recall.  I was looking at Mr. Alusa.
 9    I didn't continue to watch Brody to find out where he
10    went.
11        Q.   So when you tased Mr. Alusa, Brody was no
12    longer in your eyesight?
13        A.   My focus was on Mr. Alusa.  I -- Mr. Alusa
14    was chasing Brody.  I activated my taser and tased
15    Mr. Alusa.  And my focus, at that point, was on
16    Mr. Alusa, not any other bystanders or subjects.
17        Q.   Okay.  So my question, again, then, as
18    you're tasing Mr. Alusa, as far as your eyesight goes,
19    you didn't pick up anywhere in your eyesight where
20    Mr. Mitchell was at that time; is that correct?
21        A.   That's correct.
22        Q.   All right.  You don't know whether he was 20
23    feet away or 50 feet away, do you?
24        A.   While I was tasing Mr. Alusa?
25        Q.   Yes.
```

Kristin Marchant, RPR
DepomaxMerit Litigation Services

```
 1         A.    No, I don't.
 2         Q.    Now, when you tase somebody, isn't it true
 3   that it can incapacitate you?
 4         A.    Yes.
 5         Q.    And when you're incapacitated, you can't
 6   really control your body.  That's the whole point of the
 7   taser, isn't it?
 8         A.    If it has the full effectiveness.  Some
 9   people it does and doesn't.
10         Q.    Okay.  What are you supposed to do during
11   the tasing cycle?
12         A.    What are you supposed to do or what could
13   you do?
14         Q.    What are you supposed to do?
15         A.    I -- I'm not sure what you're looking for.
16         Q.    Well, according to your own department
17   guidelines, during the tasing cycle, what are you
18   supposed to do, as an officer?
19         A.    I don't recall.  I don't know.
20         Q.    What's the purpose of the tasing cycle?
21         A.    To temporarily immobilize them so you can
22   take them into custody.
23         Q.    Okay.  You say in your report on page 6 of
24   Exhibit 7 that Mr. Alusa was swinging.  How close was
25   Mr. Mitchell to Mr. Alusa when they were swinging?
```

```
 1        A.    I couldn't tell because I was behind
 2   Mr. Alusa.
 3        Q.    Okay.
 4        A.    So Mr. Alusa was between myself and
 5   Mr. Mitchell.
 6        Q.    And then you say he was yelling something
 7   but you couldn't tell what it was?
 8        A.    Uh-huh, yes.
 9        Q.    Is that true?
10        A.    Yes.
11        Q.    Now, in this -- your testimony, Deputy, part
12   of the problem is you said Mr. Alusa could hardly walk,
13   and he was stumbling because you thought he was drunk or
14   intoxicated; is that true?
15        A.    Yes.
16        Q.    So do you know how he could, all the sudden,
17   miraculously start running and chasing people if he could
18   hardly walk; can you explain that?
19              MR. WAYMENT:  Objection, it's argumentative
20   and misstates her testimony.
21        A.    I didn't say he could hardly walk.
22        Q.    Well, when he was going up --
23        A.    I said that he had an inability to walk
24   without stumbling.
25        Q.    I'm not talking about your report.  Yeah,
```

178

```
 1  can't run.
 2       Q.   Did he actually --
 3       A.   Intoxicated people can run.
 4       Q.   Did he actually run or did he walk
 5  quickly?
 6       A.   There was a mixture.
 7       Q.   And how long did Mr. Alusa use the mixture
 8  of walking and running, chasing Mr. Mitchell before you
 9  tased him?
10       A.   I don't know, not very long.
11       Q.   Five seconds, ten seconds?
12       A.   I don't know.
13       Q.   You don't have any idea?
14       A.   No.
15       Q.   So Mr. Alusa never tackled Mr. Mitchell; is
16  that true?
17       A.   No.
18       Q.   He did tackle him?
19       A.   No, I apologize.  He did not tackle.  It was
20  kind of two questions.
21       Q.   Okay.  All right.  And he didn't ever hit
22  him; is that true?
23       A.   That's true.
24       Q.   Okay.
25       A.   He did not make physical contact.
```

```
 1          Q.     And that's a high degree of control.  Did he
 2   get up?
 3          A.     During tasing, yes, that is a high degree.
 4          Q.     Did he get up?
 5          A.     No, he never successfully regained his
 6   stance.
 7          Q.     And Mrs. Alusa came out and she asked you to
 8   stop tasing her husband, didn't she?
 9          A.     Came out from where?
10          Q.     I don't know.  I'm just asking.  She came
11   out, and she asked you to stop tasing her husband; is
12   that true?
13          A.     Yes -- oh, she didn't ask me.
14          Q.     Well, it says here she was screaming at you
15   to stop tasing her husband.  That's -- isn't that asking
16   you?
17          A.     No.
18          Q.     What is that?
19          A.     That would be telling me.
20          Q.     So we're just talking semantics then?
21          A.     (Witness nods affirmatively.)
22          Q.     Did she tell you he had a heart condition?
23          A.     Yes.
24          Q.     You kept tasing him?
25          A.     For my safety and the safety of others,
```

Kristin Marchant, RPR
DepomaxMerit Litigation Services

```
 1        A.   But it's also my responsibility to protect
 2   others.
 3        Q.   I didn't ask you that.  I'm talking --
 4        A.   Even though he wasn't actively pursuing me,
 5   he was actively pursuing another.
 6        Q.   Okay.
 7        A.   And it's my job to protect that person.
 8        Q.   Okay.  But I'm splitting your answer up.  As
 9   to yourself, he did nothing; is that correct?
10        A.   At that time, no.
11        Q.   Okay.  So he did not do anything to put you
12   in fear for yourself; is that true?
13        A.   At that time, no.
14        Q.   At that time, yes?
15        A.   Oh, at that time, yes, that's true.
16        Q.   Okay.  And then, when you're tasering him,
17   you told me you had no idea where Brody's at; is that
18   true?
19        A.   Not that I have no idea.  As I was tasing
20   him --
21        Q.   Yeah.
22        A.   -- I didn't know his exact location.
23        Q.   He could have been back in the apartment; is
24   that true?
25        A.   It's true, but he wasn't.
```

```
 1    I just don't know what the question means.  Are you
 2    asking -- I don't want to restate your question for you,
 3    before I don't know what you mean by "intrude on."  Do
 4    you mean it violates --
 5            MR. WADDOUPS:  It violates the right.
 6            MR. WAYMENT:  Violates somebody's
 7    constitutional rights?
 8            MR. WADDOUPS:  Yeah.
 9            MR. WAYMENT:  Do you know if you have a
10    policy about violating constitutional rights for search
11    and seizure?
12            THE WITNESS:  Not that I know.
13            (Exhibit No. 14 was marked.)
14        Q.    Do you have -- let me ask you this.  Have
15    you seen that exhibit?
16        A.    Which exhibit?  This, no.
17        Q.    That's 14?
18        A.    Uh-huh.
19        Q.    You've never seen that exhibit?
20        A.    No.
21        Q.    Okay.  I'm not going to ask you any
22    questions on it.  Let me ask you this question.  Do you
23    have a policy or procedure on Use of Force?
24        A.    Yes.
25        Q.    Where is that located?
```

1         A.    I believe in Chapter 900 or 9.

2         Q.    Is that the one you -- is that the one you

3 recently reviewed?

4         A.    I guess you could call it reviewing. I

5 didn't really get a chance to review it.

6         Q.    What is your understanding of your

7 department's policy on Use of Force or excessive force?

8         A.    That the officer may use force, for less

9 lethal, that is not deadly force, that they reasonably

10 believe is necessary to effect the arrest or protect

11 themselves or others.

12         Q.    Does that force -- or does that policy, to

13 your knowledge, extend to any situation or to any

14 potential crime, or do you have to look at the severity

15 of the crime as to whether you can implement the

16 policy?

17         A.    I would say it's based on the circumstance.

18         Q.    And when you say "based on the

19 circumstance," what do you mean by that?

20         A.    It depends on the situation that I'm in.

21         Q.    Well, if you're -- if you're making a stop

22 for a parking ticket, do you know whether you can

23 exercise your Use of Force policy and use force regarding

24 a parking ticket?

25         A.    If I'm just doing a parking ticket, nothing

Kristin Marchant, RPR
DepomaxMerit Litigation Services