IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LIUFAU ALUSA and KATIE ALUSA,<br><br>Plaintiffs,<br><br>vs.<br><br>SALT LAKE COUNTY, JAMES M.<br>WINDER, and TIANA BROOS,<br><br>Defendants. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 2:11-cv-184 |

     Plaintiffs Liufau Alusa and Katie Alusa are seeking damages for alleged injuries that occurred when Mr. Alusa was tased by a Salt Lake County Sheriff's Deputy named Tiana Broos during an incident that occurred outside the Alusas' apartment. The Plaintiffs argue that Deputy Broos's use of the taser constituted excessive force in violation of the Fourth Amendment of the United States Constitution. The Plaintiffs have additionally asserted claims of municipal liability against Salt Lake County and Sheriff James M. Winder, as well as a number of state law causes of action against all of the Defendants. The Defendants argue that Deputy Broos is entitled to qualified immunity for her actions and move the court to enter summary judgment in their favor on a number of the Plaintiffs' claims. For the reasons stated below, the Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

FACTUAL BACKGROUND

     Liufau Alusa and his wife Katie Alusa live in the same apartment complex as Deputy

Broos, although Deputy Broos had not had any interactions with the Alusas before the encounter described below.  On April 18, 2009, Deputy Broos was at home for a meal while she was working the graveyard shift.  She was wearing her uniform and Brodie Mitchell, her boyfriend at the time, was also with her.  Deputy Broos heard "yelling and screaming and loud banging noises" coming from outside her apartment and went to investigate.  (Broos Dep. 124.)  The parties dispute almost all of the events that occurred after this point.

According to Deputy Broos, the noises sounded "like somebody was seriously getting injured" and she was concerned for his or her safety.  (*Id.* at 128.)  As Deputy Broos approached the area from which the commotion seemed to be emanating, she saw a woman "fly backwards out from behind [a] dumpster."  (*Id.* at 138.)  Deputy Broos believed that this woman, who she later identified as Ms. Alusa, had been shoved or pushed.  Although she did not witness Ms. Alusa being hit or pushed, Deputy Broos testified that she saw a "large Polynesian male charging toward [Ms. Alusa]," a man that Deputy Broos later discovered was Mr. Alusa.  (*Id.* at 139.)  Deputy Broos's then boyfriend, Mr. Mitchell, also describes the scene.  He testified that he came outside with Deputy Broos and saw two males and a female arguing and pushing each other near a garbage dumpster.  (Mitchell Dep. 73-74.)  When Deputy Broos approached the three people,[1] Mr. and Ms. Alusa went upstairs to their apartment and shut the door.  (Broos Dep. 135.)  Deputy Broos testified that Mr. Alusa lunged at her as he passed her on his way up to the apartment with Ms. Alusa.  (*Id.* at 150; Mitchell Dep. 94.)  Deputy Broos then attempted to ask some questions of Jeffrey Po'uha, who was the other male present at the scene.  (Broos Dep. 143-44; Mitchell

---

[1]Deputy Broos testified that she "made contact" with Mr. and Ms. Alusa, but it is not clear what happened during this encounter.  (Broos Dep. 135.)

Dep. 75-76.)  Mr. Po'uha is a third cousin to Mr. Alusa, but describes himself as Mr. Alusa's brother.

The Alusas relate a different version of this initial encounter with Deputy Broos.  Ms. Alusa testified that she was not outside with Mr. Alusa by the dumpster when Deputy Broos first appeared to investigate the commotion.  Instead, Ms. Alusa claims that she was upstairs in her apartment and heard noises coming from outside.  (K. Alusa Dep. 16.)  When she went downstairs, she saw her husband standing with Mr. Po'uha and Deputy Broos.  (*Id.* at 17.)  Ms. Alusa knew that her husband had been drinking because she had seen him drink two beers earlier that day.  (*Id.* at 18.)  She told Mr. Alusa, "Let's go inside," and the two headed upstairs into the apartment.  (*Id.* at 19.)  Ms. Alusa does not recall speaking with anyone as they were going upstairs and does not mention that Mr. Alusa ever lunged or charged at Deputy Broos.  (*Id.* at 19, 49.)  Mr. Alusa tells a story that is similar to the one related by his wife.  He testified that he had drunk eighty ounces of Olde English earlier that day and was arguing with a friend on the phone.  (L. Alusa Dep. 19, 21.)  He admits to punching a dumpster and a fence during that conversation.  (*Id.* at 19-20.)  But, like Ms. Alusa, he never stated that he charged at Deputy Broos.  Mr. Po'uha's eyewitness account of what happened also fails to mention any aggressive interaction between Mr. Alusa and Deputy Broos.

According to Deputy Broos, she heard screaming, yelling, and banging coming from the Alusas' apartment while she was talking to Mr. Po'uha.  (Broos Dep. 144.)  Shortly thereafter, she states that Mr. Alusa came running down the stairs from his apartment.  (*Id.* at 161-62.)  Once Mr. Alusa was on the sidewalk, Deputy Broos states that he headed toward Mr. Mitchell with his fists clenched and his arms swinging.  (*Id.* at 162.)  Mr. Mitchell describes the scene as

follows: "Yeah, he ran down the stairs. Glanced over here. For whatever reason I was standing here. He made eye contact with me and began chasing after me." (Mitchell Dep. 78.) Mr. Mitchell testified that Mr. Alusa was "throwing punches" as Mr. Alusa came towards him. Deputy Broos commanded Mr. Alusa to stop. (Broos Dep. 181; Mitchell Dep. 82.) She then tased Mr. Alusa. (Broos Dep. 176.)

Other eyewitnesses tell a different story. According to Mr. Alusa, he left his apartment to go for a walk. (L. Alusa Dep. 29.) As he was leaving the apartment complex, Mr. Mitchell began yelling at him and pointing at him. (*Id.* at 30.) Mr. Alusa walked toward Mr. Mitchell to ask him who he was, but testifies that he was not swinging his arms when he did so. (*Id.* at 31.) Mr. Alusa states that he did not hear Deputy Broos give any commands before she began tasing him. (*Id.* at 32.) Mr. Po'uha, who had been outside speaking with Deputy Broos before Mr. Alusa came out of his apartment,[2] recounts a similar version of events. Mr. Po'uha states that, not long after the Alusas went into their apartment, Mr. Alusa came back out and ran down the stairs, past Mr. Po'uha and Deputy Broos. (J. Po'uha Dep. 27.) Mr. Po'uha says that Mr. Alusa was swearing in Tongan and English as he ran. (*Id.* at 30.) After Mr. Alusa ran past him, Mr. Po'uha saw Mr. Mitchell approach Mr. Alusa. Mr. Po'uha testified that it was Mr. Mitchell who was acting in an aggressive manner, with his fists clenched and his chest out. (*Id.* at 27.) Mr. Po'uha's wife, Sara, stated that Mr. Alusa initially appeared to have a "bring it on" type of response to Mr. Mitchell, but then "stepped back" and turned his body as if he "was going to go the other way." (S. Po'uha Dep. 29.) At that point, Deputy Broos tased Mr. Alusa.

---

[2]Mr. Po'uha testified that Deputy Broos kept asking him, "What's wrong with [Mr. Alusa]?" The only reply Mr. Po'uha made was: "I don't know. We just got here" (referring to his wife, Sara, who was nearby). (J. Po'uha Dep. 26.)

The taser log indicates that Deputy Broos discharged the taser device a total of five times. (Broos Dep., Ex. 1.)  The discharges had the following durations: 50 seconds, 51 seconds, 17 seconds, 4 seconds, and 2 seconds.  While Deputy Broos was tasing Mr. Alusa, a crowd of bystanders gathered around them.  The group included Jeffrey Po'uha and his wife Sara Po'uha, two upstairs neighbors, and, eventually, Ms. Alusa, who testified that Ms. Po'uha ran up to her apartment to tell her that her husband was being tased.  (K. Alusa Dep. 21.)  Mr. Po'uha states that the group was yelling at Deputy Broos to stop tasing Mr. Alusa: "Everybody—actually the group that I was with were yelling at the officer that's enough.  Can't you see that [Mr. Alusa]'s down?  He can't move."  (J. Po'uha Dep. 35.)  Ms. Alusa was distraught and cried out: "Stop it, please stop it, you're killing him."  (K. Alusa Dep. 24.)[3]  Deputy Broos and Mr. Mitchell both stated that, after the initial tasing, Mr. Alusa was using his arms in an effort to stand up and to remove the taser probes from his back.  (Broos Dep. 182-83; Mitchell Dep. 83.)  But Mr. Po'uha testified that Mr. Alusa was motionless and lying face down on the asphalt as Deputy Broos was tasing him.  (J. Po'uha Dep. 53.)  And Mr. Alusa contends that, at some point during the tasing, he became unconscious.  (L. Alusa Dep. 34.)  The only statement from Deputy Broos he remembers hearing was a command to put his hands behind his back: "I remember lifting my hands up and a pain in my back and got tased again.  And I don't remember after that."  (*Id.*)  At least two witnesses testify that Deputy Broos never attempted to put handcuffs on Mr. Alusa during the tasing.  (Mitchell Dep. 99; J. Po'uha Dep. 54.)

Paramedics arrived at the scene after the tasing had stopped and found that Mr. Alusa was

---

[3]Ms. Alusa also told Deputy Broos that Mr. Alusa had a heart condition, although he has never been diagnosed with this condition.  Ms. Alusa testified that she was saying "[j]ust anything . . . just begging [Deputy Broos] to stop."  (K. Alusa Dep. 26.)

unresponsive.  (Glover Dep. 11.)  Mr. Alusa did not regain consciousness until he was in the

hospital.  (L. Alusa Dep. 34.)  Mr. Alusa testified that, after the incident, he has lost about thirty

pounds, he is weak and unable to lift heavy objects, he is constantly tired, and he becomes overly

nervous if he encounters law enforcement.  (*Id.* at 51, 53.)  He also stated that he suffers from

nightmares, night sweats, mood swings, and fear.  (*Id.* at 53.)

MOTIONS IN LIMINE

The Defendants move the court to exclude a number of pieces and categories of evidence

that the Plaintiffs have submitted in support of their claims.  The court finds that, in general,

these motions in limine are premature because they deal with issues that more appropriately

relate to the admissibility of evidence at trial.  But because the court agrees that some of the

Plaintiffs' evidence should not be considered even on a motion for summary judgment, the court

addresses the motions in limine here.

## I.        Character Evidence: Deputy Broos

The Plaintiffs argue that Deputy Broos does not possess adequate qualifications to be a

police officer and cite a number of transgressions that they believe support their assertion.  This

evidence mostly consists of violations of rules and regulations that Deputy Broos allegedly

committed while living at her apartment complex.  The court will consider this evidence because

it is relevant to the Plaintiffs' inadequate hiring claim against Salt Lake County.  Accordingly,

the Defendants' motion to exclude evidence of Deputy Broos's character is DENIED WITHOUT

PREJUDICE to refile.

## II.      Character Evidence: Brodie Mitchell

The Defendants move to exclude any evidence that Brodie Mitchell was an alcoholic.

6

The court agrees with the Defendants that this fact is not relevant because the Plaintiffs have not uncovered any evidence that Mr. Mitchell was drinking on the night of the incident.  As a result, the Defendants' motion to exclude evidence of Mr. Mitchell's character is GRANTED.

**III.     Use of Force Policy**

The court finds that Salt Lake County's Use of Force Policy may be relevant to the Alusas' claim that the County provided inadequate training to its police officers related to the proper use of tasers.  The court DENIES the Defendants' motion to exclude this evidence WITHOUT PREJUDICE to refile.

**IV.     Facts Related to the Taser**

The Defendants move to exclude certain facts submitted by the Plaintiffs related to tasers, including the recommended taser discharge time, the reference to tasers as "taser guns," and the statement that a taser delivers 50,000 volts.  The court finds that this motion is premature and DENIES the Defendants' motion WITHOUT PREJUDICE to refile.

**IV.     *Daubert* Motions**

The Defendants move the court to set a *Daubert* hearing in which the court may judge the admissibility of the opinions of two of the Plaintiffs' experts.  The Defendants object to the information provided in the expert reports of Dr. Robert Rothfeder, whose testimony concerns the symptoms and effects of post traumatic stress disorder, and Dr. David Doddridge, whose testimony concerns the use of force in police departments.  The court finds that these motions are premature.  At this stage of the proceedings, the court must take the facts in the light most favorable to the non-moving party.  As a result, the court assumes that Mr. Alusa's psychological suffering after the tasing incident, whether or not it amounts to post traumatic stress disorder, is

real. Additionally, it is unclear what testimony by Dr. Doddridge the Plaintiffs plan to present at trial, since that question will no doubt be impacted by the resolution of the motion for summary judgment. For these reasons, the court DENIES the Defendants' *Daubert* motions WITHOUT PREJUDICE to refile as trial approaches.

ANALYSIS

There are three Defendants remaining in this case: Salt Lake County, Sheriff James Winder (sued individually and in his official capacity), and Deputy Tiana Broos (sued individually and in her official capacity). At the hearing that the court held in this matter on July 15, 2013, the Plaintiffs confirmed that they are no longer pursuing a number of claims and theories contained in their Amended Complaint (Dkt. No. 3). These claims include any § 1983 claims based on violations of the First or Fifth Amendments, as well as any claims under the Utah Constitution. Additionally, the Plaintiffs are not asserting a failure to intervene claim against any officers. With these clarifications in mind, the court now addresses the three issues brought up by the Defendants in their Motion for Summary Judgment: 1) qualified immunity; 2) municipal liability under § 1983; and 3) disposition of the remaining state law claims.

## I.      Qualified Immunity and Excessive Force

Qualified immunity "provides 'immunity from suit rather than a mere defense to liability.'" *Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir. 2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The doctrine protects police officers from civil liability for discretionary actions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

A.  Standard of Review

Generally, summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Because Deputy Broos raises the defense of qualified immunity, the Alusas (the non-movants here) bear the burden of demonstrating that the law was clearly established at the time the conduct occurred and that evidence supports a finding that Deputy Broos violated that clearly established law.  *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989).  Only after the Alusas have satisfied their burden does Deputy Broos "assume the normal burden of a movant for summary judgment of establishing that no material facts remain in dispute that would defeat . . . [her] claim of qualified immunity."  *Id.* at 1457.  Overall, even though the burden shifts to the non-movant, the court must view the facts in a light most favorable to the non-moving party.  *See Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010).

The Alusas' central contention in this case is that Deputy Broos used excessive force when she tased Mr. Alusa for an extended period of time.  The Alusas raise this claim in the context of an investigatory stop or arrest, and their claim must therefore be analyzed under the Fourth Amendment, which guarantees a citizen the right to be free from unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  The court must determine whether Deputy Broos's actions were objectively reasonable in light of the facts and circumstances confronting her, and without regard to her underlying intent or motivation.  *See id.* at 397.  In its analysis, the court must carefully balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396.  To

balance the government's interest against the nature of the intrusion, the court applies the three factors enunciated by the Supreme Court in *Graham*: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the officer or others; and (3) whether the suspect is actively resisting arrest or fleeing to avoid arrest. *Id.*

Before applying these factors, the court notes that the Supreme Court has held that the courts may address the issues of constitutional violation and clearly established right in any order deemed appropriate for the particular case. *Pearson v. Callahan*, 555 U.S. 223, 235-42 (2009). In the context of an excessive force case, "an officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as [she] did." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007). The court also notes that, ordinarily, the Alusas must demonstrate that there is a Supreme Court or a Tenth Circuit decision on point stating that the law Deputy Broos is accused of violating was clearly established. *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008). But the Alusas do not need to show that the very act in question was previously held unlawful. Rather, the contours of the law "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

The fact that the use of a taser can constitute excessive force was clearly established as early as the Tenth Circuit's decision in *Casey*, which was issued in 2007. *See Harper v. Rose*, 2012 WL 1150463, at *5 (D. Utah Apr. 5, 2012). But whether Deputy Broos's use of the taser and the duration of that use were objectively reasonable is a question that must be analyzed in light of the specific facts and circumstances of the case. To conduct this analysis, the court now

10

applies the *Graham* factors.

### B.  Analysis of the *Graham* Factors

#### 1.  *Severity of the Crime*

After the incident, Mr. Alusa pled guilty to one count of Intoxication, which is a Class C misdemeanor under Utah law, and one count of Interference with an Arresting Officer, which is a Class B misdemeanor under Utah law.  On balance, these crimes are relatively minor offenses. In addition, Mr. Alusa's plea bargain in state court is only somewhat helpful in determining the details of the interaction between Mr. Alusa and Deputy Broos.  First, the court must evaluate the case from the perspective of a reasonable officer at the scene.  Given that it is uncontested that Mr. Alusa was having a loud argument on his phone and that he admits to hitting the dumpster and the fence, a reasonable officer may have suspected that Mr. Alusa was drunk.  But there is no evidence that Deputy Broos knew or should have known the level of Mr. Alusa's intoxication. Taking the facts in the light most favorable to Mr. Alusa, Deputy Broos simply knew that Mr. Alusa had been yelling and making other loud noises.

As for Mr. Alusa's admission in the State criminal proceeding that he interfered with an arresting officer, it is difficult to determine from the elements of that offense the extent to which Mr. Alusa's guilty plea corroborates Deputy Broos's version of what happened.  Utah law provides that a defendant is guilty of interference with an arresting officer when the defendant knows "or by the exercise of reasonable care should have knowledge" that a police officer is seeking to effect a lawful arrest or detention and interferes with that arrest or detention by: (1) using force or a weapon; (2) refusing to perform an act requested by the officer or necessary to effect the arrest; or (3) refusing to refrain from performing an act that impedes the arrest.  Utah

Code Ann. § 76-8-305. Because the statute is written in the disjunctive, the court does not know which category or facts Mr. Alusa has admitted apply to him by virtue of his guilty plea. His interference could consist solely in his failure to acknowledge Deputy Broos's command when she cried "Stop."

Given the relatively minor nature of Mr. Alusa's crimes, the court finds that the first factor weighs in the Alusas' favor.

2. *Whether Mr. Alusa posed an immediate threat to Deputy Broos or others*

This factor depends on facts that are in dispute between the parties about how Mr. Alusa acted during the course of the evening and especially in the moments leading up to the tasing. The Defendants urge the court to accept as uncontested the facts contained in the Affidavit of Probable Cause that is attached to the Amended Information filed against Mr. Alusa in state court. The Amended Information lists the counts to which Mr. Alusa pled guilty, and the Affidavit of Probable Cause contains statements about the incident, including allegations that Mr. Alusa lunged at Deputy Broos and that he later attempted to punch Mr. Mitchell. But the court is not persuaded that it should adopt this version of the facts. The Defendants have failed to provide the court any evidence of the contents of Mr. Alusa's written plea agreement or of the plea colloquy that occurred with the state judge. As a result, the court cannot know whether Mr. Alusa admitted any of the specific allegations contained in the Affidavit of Probable Cause, or if he merely pled guilty to the count of interference without admission of any specific facts contained in the Probable Cause Affidavit.

The court's analysis above is distinct from a separate argument the Defendants make about the appropriateness of using a § 1983 action to collaterally attack a criminal conviction.

12

The court agrees with the Defendants that Mr. Alusa may not challenge his state court conviction in a federal civil rights proceeding. *See Heck v. Humphrey*, 512 U.S. 477 (1994). But while *Heck* prevents the court from awarding any judgment in Mr. Alusa's favor that would imply the invalidity of the state court proceeding, this bar does not prevent Mr. Alusa from asserting an excessive force claim here. Even though Mr. Alusa has admitted through his guilty plea that his arrest for intoxication and interference were supported by probable cause,[4] Mr. Alusa may still challenge the amount of force that Deputy Broos used to effect that arrest. In addition, the prohibition provided by *Heck* does not conclusively establish the facts that occurred the evening of the incident. As discussed above, the Defendants have not provided the court with sufficient information about the specific facts to which Mr. Alusa pled guilty to prevent the Alusas from challenging the version of events provided by Deputy Broos and Mr. Mitchell.

As a result, the court must abide by its obligation on summary judgment to consider the facts in the light most favorable to the non-moving party. Interpreting the deposition testimony in this light, there is evidence that Mr. Alusa left his apartment to go on a walk and was accosted by Mr. Mitchell, who approached Mr Alusa in an aggressive manner and with clenched fists. Deputy Broos then tased Mr. Alusa without warning and without giving him a chance to respond to her command to stop. At least one eyewitness, Sara Po'uha, testified that it appeared as if Mr. Alusa was turning to walk away from Mr. Mitchell right before he was tased. (S. Po'uha Dep. 29.) It is not genuinely contested that Mr. Alusa was swearing and was being "unmanageable" to

---

[4]In Paragraph 89 of their Complaint, the Plaintiffs allege that Deputy Broos did not have "probable or reasonable cause to stop and detain Mr. Alusa." The court agrees with the Defendants that Mr. Alusa is estopped from making this argument based on his guilty plea. The only Fourth Amendment claims that the court will allow to proceed to trial are the Alusas' claims of excessive force.

some degree (J. Po'uha Dep. 33). But a reasonable jury could find that, despite being loud and angry, Mr. Alusa did not pose an immediate threat to anyone until he was confronted by Mr. Mitchell. Still, the court is mindful that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly-evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. A reasonable jury could also find that Mr. Alusa posed a threat because he was acting unusually and appeared belligerent.

Given the tension between the fact that Mr. Mitchell may have been the initial aggressor and the fact that Mr. Alusa does not dispute being drunk and upset, the court finds that the second factor of whether Mr. Alusa posed an immediate threat to anyone weighs equally in favor of both sides.

### 3. *Whether Mr. Alusa was actively resisting arrest or fleeing*

There is no evidence that Deputy Broos attempted to place Mr. Alusa under arrest before tasing him. Although Deputy Broos states that she yelled at Mr. Alusa to stop as he was moving toward Mr. Mitchell, it appears that she tased Mr. Alusa almost immediately after this command. There is also no evidence that Mr. Alusa was attempting to flee. Regardless of what occurred between Mr. Alusa and Mr. Mitchell, both parties agree that some sort of interaction was taking place. According to Mr. Alusa, he was walking toward Mr. Mitchell to find out why Mr. Mitchell was yelling at him. Taking these facts in the light most favorable to the Alusas, it does not appear that Mr. Alusa was trying to flee at the moment he was tased.

For these reasons, the court finds that third factor weighs in favor of the Alusas.

14

<u>C.  Application of the *Graham* Factors</u>

Looking at the three *Graham* factors as a whole, and assuming the circumstances as viewed most favorably to the Alusas, the court finds that a reasonable officer would have used a lesser amount of force than Deputy Broos employed to arrest Mr. Alusa.  Mr. Alusa was a misdemeanor defendant who was not resisting arrest or attempting to flee, and it is unclear if he posed an immediate threat to anyone, or if he was the instigator or escalating force behind any possible threat that he did pose.  These factors weigh even more strongly in Mr. Alusa's favor if the court applies them to the subsequent tasings that occurred while Mr. Alusa was on the ground.  While the details of what happened while Deputy Broos was tasing Mr. Alusa are also disputed, there is evidence that Mr. Alusa was unconscious during part of the tasings, that he was lying face down on the pavement, and that any movement he did make was an attempt to comply with Deputy Broos's order to put his hands behind his back.  Assuming the truth of this evidence, it is highly unlikely that Mr. Alusa was resisting arrest, trying to flee, or that he posed a threat to anyone.

The Defendants urge the court to bifurcate its analysis of excessive force and consider the lawfulness of the initial tasing separately from the lawfulness of the subsequent tasings.  This kind of approach has been used in Utah courts before.  *See Harper v. Rose*, 2012 WL 1150463, at *7 (D. Utah Apr. 5, 2012) (breaking up a series of tasings of one plaintiff into three analytically distinct moments: the initial tasing, the second tasing, and the remaining tasings that occurred during a fight on the ground).  While the court agrees with the Defendants that the question of whether Deputy Broos was initially justified to use force is a closer call, the court is not persuaded at this stage of the proceedings that there would be any benefit to distinguishing

between Deputy Broos's initial use of the taser and the subsequent tasings. As the court discussed above, a reasonable jury who believed the Alusas' version of events could find that even the initial tasing constituted excessive force. Moreover, it is difficult in this case to make a distinction between the question of whether the initial use of the taser was justified and the question of whether the duration of the tasings was justified. Unlike the facts of *Harper*, in which the initial tasing lasted about five seconds, the taser log in this case shows that Deputy Broos tased Mr. Alusa for fifty seconds the first time she used the taser. As the Defendants point out, there is no case holding that the use of a taser becomes unreasonable after a specific time. Instead, this question depends on the facts and circumstances of the case. The court finds that a jury must decide whether Deputy Broos used excessive force when she first tased Mr. Alusa; and, if she did not, if there was nevertheless a point during the initial fifty seconds or during the subsequent tasings at which Deputy Broos's use of force became excessive.

For the reasons stated above, Deputy Broos has not met her burden of showing that there is no genuine dispute of material fact about whether her actions were objectively reasonable. As a result, she is not entitled to qualified immunity.

## II. Municipal Liability

"A municipality may not be held liable under [42 U.S.C.] § 1983 solely because its employees inflicted injury on the plaintiff." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation omitted). It may be held liable under § 1983 only "for *its own* unconstitutional or illegal policies." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (emphasis added). For this reason, "a municipality is liable only when the official policy [or unofficial custom] is the moving force behind the injury alleged." *Id.* (quotation omitted). A

plaintiff must show not only that his injury was the result of a custom or policy, but that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 2013 WL 2421071, at *7 (10th Cir. June 5, 2013). These requirements are intended to prevent municipal liability under § 1983 from collapsing into mere *respondeat superior* liability. *See Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997).

In the recent *Schneider* case, the Tenth Circuit developed a test to summarize the requirements discussed above. To impose liability on a municipality, a plaintiff must show three specific elements: (1) an official policy or custom, (2) causation, and (3) state of mind. *Schneider*, 2013 WL 2421071, at *7.

The "official policy" prong is intended to distinguish acts of the municipality from acts of the employees of the municipality. *Id.* An official policy or custom may take any of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryon*, 627 F.3d at 788. Here, the Plaintiffs have focused on two theories supporting their claim that Salt Lake County[5] is liable for Deputy Broos's use of excessive force: the County's alleged

---

[5]The court refers only to the claims against Salt Lake County, although the same reasoning applies to the Plaintiffs' claims against Sheriff Winder in his official capacity.

inadequate hiring and retention of Deputy Broos and its failure to properly train or supervise her. These two theories both fit into the fifth category of policy or custom, but the Supreme Court has noted the difference between the two. *See Barney*, 143 F.3d at 1308 ("The Court [in *Brown*] emphasized the difference between failure-to-train and inadequate-hiring claims and refused to simply import the reasoning of [*City of Canton v. Harris*, a failure-to-train case] into the hiring context") (quotation omitted).

At the hearing the court held on this matter, the Plaintiffs stated that they were also pursuing a claim based on a formal regulation or policy statement made by Salt Lake County. But the Plaintiffs have not directed the court to any section of the County's Use of Force policy or other regulations that the Plaintiffs specifically maintain are unconstitutional. Instead, the Plaintiffs rely on statements made by Nick Roberts, the range master who is responsible for firearm and taser training. The court is not persuaded by the Plaintiffs' argument because they have provided no evidence that Mr. Roberts's oral pronouncements rise to the level of a formal regulation or policy statement. The court will, however, consider Mr. Roberts's statements when it addresses the Plaintiffs' allegation that Salt Lake County failed to adequately train its police officers.

### A. Inadequate Hiring

The Supreme Court has stated that "[c]ases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause." *Brown*, 520 U.S. at 415. When reviewing a hiring decision, the court must "carefully 'test the link' between the policymaker's hiring decision and the particular injury alleged." *Id.* at 412 (citation omitted).

Here, the court is persuaded by the Defendants' argument that the Alusas have not provided any evidence of inadequate hiring or retention. The Alusas point to a number of violations of apartment rules and regulations that Deputy Broos allegedly committed while she was living at her apartment complex. But Deputy Broos moved into the apartment complex after she was already working for the County. The Plaintiffs have provided no evidence that the County would have had reason to be suspicious of Deputy Broos during the initial hiring. And it is doubtful that any supervisor would or should have had any reason to be aware of the complaints, since the violations are all fairly minor (starting a bonfire outside her apartment, letting her dog run around off leash, storing trash outside her door). Finally, none of the apartment complex infractions were sufficiently connected to the subsequent alleged constitutional violation, since the infractions were not violent in nature and would not have alerted a supervisor that Deputy Broos was likely to tase someone inappropriately or otherwise use excessive force.

At the hearing, the Plaintiffs provided the court with additional documentation about Deputy Broos's record. While the Plaintiffs gave this information to the court too late to allow the Defendants a chance to respond, the court nevertheless has examined the record to determine whether Deputy Broos has a criminal history or other relevant background that should have given a hiring officer reason to suspect that Deputy Broos was prone to use excessive force in confrontations. At most, the court notes that Deputy Broos admits to striking her boyfriend twice, both times while she was pregnant. Detective Brad Smith, who was conducting the evaluation, stated that Deputy Broos was "concerned" about the incident and "realize[d] it was wrong." Detective Smith also contacted her boyfriend, who stated that the problem had been

"quickly resolved" and that he and Deputy Broos had not had further issues.  This isolated

incident, which Salt Lake County investigated before hiring Deputy Broos, does not demonstrate

that Deputy Broos was likely to commit a constitutional violation.  This link is simply too

speculative and remote for a reasonable jury to find that the County's decision to hire Deputy

Broos manifests deliberate indifference to the rights of people with whom Deputy Broos later

came into contact.

Accordingly, the court GRANTS the Defendants' Motion for Summary Judgment on the

inadequate hiring claim and holds that the Plaintiffs may not proceed on this theory.

B.  Failure to Train

The Plaintiffs have also asserted a claim against Salt Lake County based on its alleged

failure to adequately train its police force.  When suing a municipality under this theory of

liability, a plaintiff must prove the following five elements:

> (1) the training was in fact inadequate . . . [;] (2) the officers exceeded
> constitutional limitations on the use of force; (3) the use of force arose under
> circumstances that constitute a usual and recurring situation[] with which police
> officers must deal; (4) the inadequate training demonstrates a deliberate
> indifference on the part[] of the city toward persons with whom the police officers
> come into contact[;] and (5) there is a direct causal link between the constitutional
> deprivation and the inadequate training.

*Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003); *see also City of Canton v. Harris*, 489 U.S.

378, 388 (1989).

The second prong of this analysis is satisfied here because, as the court held above, a

reasonable jury could determine that Deputy Broos used excessive force against Mr. Alusa in

violation of a clearly established law.  The third prong is also met, since Deputy Broos and Mr.

Alusa were involved in a situation that police officers must frequently confront.

Addressing the first prong, the Plaintiffs argue that the County does not correctly instruct its officers whether the law uses an objective or subjective standard to determine whether the use of force is reasonable. According to Deputy Broos, the standard is a subjective one:

> Q:     [D]oes your department . . . give you the freedom to subjectively decide how long and how often you tase somebody; yes or no?
>
> Broos: Based on the circumstances?
>
> Q:     Yes.
>
> Broos: Yes.

(Broos Dep. 87.) Nick Roberts, the range master for Salt Lake County who is responsible for firearm and taser training, also appeared confused during his deposition about the use of an objective or subjective standard to determine reasonable force. (Roberts Dep. 33-34 ("Q: I just want to know whether [the law uses an] objective or subjective standard. Do you know? Roberts: I don't.").)

The Defendants argue that, even if Deputy Broos and Rangemaster Roberts get the legal standard wrong, they are still applying it correctly because they both believe that an officer must use reasonable force as determined by the facts and circumstances of the situation. But the failure to be clear on this issue has led at least one other Utah judge to allow a failure to train claim to survive summary judgment in an excessive force case involving the use of a taser. In *Cavanaugh v. Woods Cross City*, the Honorable Tena Campbell noted that the police chief "consistently and repeatedly testified that officers were told in their training that the decision to use force is a solely subjective analysis." 2009 WL 4981591, at *5 (D. Utah Dec. 14, 2009). Judge Campbell denied summary judgment to the municipality on the failure to train claim,

holding:

> If true that a policy existed in which officers were trained to use only their own subjective judgment when firing a Taser, such a policy would be in violation of the constitutional standards for use of force. Therefore, provided it was the moving force behind the violation, the policy would subject the municipality to liability.

*Id.*

The court agrees with Judge Campbell's analysis and finds that the Alusas have demonstrated that there are disputed issues of material fact regarding what training standards were used by Salt Lake County regarding the use of force and whether the training was inadequate as a result. While the Alusas still have to prove that the County was deliberately indifferent and that the inadequate training was the cause of Mr. Alusa's constitutional deprivation, a reasonable jury could answer these questions in favor of the Alusas. Accordingly, the Defendants' Motion for Summary Judgment is DENIED as it pertains to the Alusas' failure to train claim.

## III.  State Law Claims and Immunity

The Defendants argue that all of the Plaintiffs' state law claims should be dismissed under the Governmental Immunity Act of Utah (GIAU). They also contend that the Plaintiffs' claims for loss of consortium and negligent infliction of emotional distress should be dismissed for additional reasons.

### A.  State Law Immunity

The GIAU provides that, subject to various waivers, "each governmental entity and each employee of a governmental entity are immune from suit for any injury that results from the exercise of a governmental function." Utah Code Ann. § 63G-7-201. Some provisions of the

GIAU contain exceptions to this blanket immunity that apply to governmental employees, while other provisions contain waivers that only apply to governmental entities.

The GIAU waives immunity for governmental employees if a plaintiff shows that they "acted or failed to act through fraud or willful misconduct." Utah Code Ann. § 63G-7-202(3)(c)(i). Although the Plaintiffs state in their Amended Complaint that they are bringing intentional tort claims against all of the Defendants, these claims all relate to Deputy Broos's tasing of Mr. Alusa. The Plaintiffs may still pursue these claims against Deputy Broos. *See Cavanaugh*, 2009 WL 4981591, at *6-7 (denying summary judgment for intentional tort claims against police officer because the GIAU waives immunity for those claims). But there is no evidence that Sheriff Winder was involved in any intentional torts. Instead, the allegations against Sheriff Winder are focused on claims for inadequate hiring and failure to train, which sound in negligence. Because the GIAU does not waive immunity for governmental employees for acts of negligence, Sheriff Winder is immune against actions for his hiring and training decisions.

For governmental entities, the GIAU waives immunity if a plaintiff's injury is caused "by a negligent act or omission of an employee committed within the scope of employment." Utah Code Ann. § 63G-7-301(4). But this waiver of immunity is itself subject to exceptions for injuries arising out of, or "in connection with" the exercise or performance of a discretionary function ("whether or not the discretion is abused"), or claims of assault, battery, or violation of civil rights. Utah Code Ann. § 63G-7-301(5)(a)-(b). The Plaintiffs claims fall into these exceptions. Sheriff Winder's employment and training decisions, as well as Deputy Broos's decision to use the taser, were all discretionary functions. Whether or not these functions were

abused, the GIAU provides immunity to Salt Lake County for these sorts of decisions by its employees. In addition, Mr. Alusa's injuries arose out of his tasing by Deputy Broos, an action which is related to claims of assault and battery, as well as claims of civil rights violations. The GIAU grants immunity to Salt Lake City for these claims. *See id.*

For these reasons, the court dismisses the Defendants' Fourth and Fifth Claims for state law negligence. The Defendants may proceed with their Sixth Claim for intentional torts against Deputy Broos, but not against any other Defendants. The court also dismisses Ms. Alusa's claim for negligent infliction of emotional distress, which is barred for the same reasons that the GIAU bars the other state law claims for negligence. Because the Defendants are granted immunity from the negligent infliction of emotional distress claim, the court does not address the Defendants' argument that Ms. Alusa's claim is additionally barred because she was not in the zone of danger.

### B. Loss of Consortium

Ms. Alusa's claim for loss of consortium is a derivative claim, meaning that she cannot recover unless Mr. Alusa can also recover for his injuries on another theory. As discussed above, the court dismisses Mr. Alusa's negligence causes of action. But Ms. Alusa can still seek to recover for loss of consortium on Mr. Alusa's intentional torts claim against Deputy Broos.

The Defendants argue that the Alusas have nevertheless failed to provide evidence of injuries that would be serious enough to sustain a loss of consortium claim. Under Utah state law, "[t]he spouse of a person injured by a third party . . . may maintain an action against the third party to recover for loss of consortium." Utah Code Ann. § 30-2-11(2). The statute defines such injury as

a significant permanent injury to a person that substantially changes that person's lifestyle and includes the following:

> (i)     a partial or complete paralysis of one or more of the extremities;
>
> (ii)    significant disfigurement; or
>
> (iii)   incapability of the person of performing the types of jobs the person performed before the injury.

*Id.* § 30-2-11(1)(a).  The Utah Supreme Court has ruled that the words "and includes" should not be read to introduce an exhaustive list.  *Boyle v. Christensen*, 251 P.3d 810, 819 (Utah 2011).  While a plaintiff may satisfy her burden to show that her spouse suffered an injury by presenting evidence that one of the statutory categories describes her spouse's injury, she need not do so to prevail on her loss of consortium claim.  *Id.* at 820.

The Defendants argue that Mr. Alusa has been able to return to his old job and that Ms. Alusa's claim must therefore fail.  But under *Boyle*, the Alusas do not need to demonstrate that their case fits one of the specific examples provided by the statute.  Instead, they need only submit competent evidence to show that Mr. Alusa suffered a "significant permanent injury" that "substantially change[d]" his life.  *See* Utah Code Ann. § 30-2-11(2).  The court finds that the Alusas have met their burden on this point by submitting credible deposition testimony that Mr. Alusa lost thirty pounds after the incident, that he can no longer lift heavy objects at work, that he is constantly tired and lacks energy, and that he suffers psychological symptoms like nightmares, mood swings, fear, and possible post traumatic stress disorder.  It is appropriate for a jury to decide whether these facts rise to the level of an injury as defined by the statute.

Accordingly, the Defendants' Motion for Summary Judgment on Ms. Alusa's loss of consortium claim is DENIED WITHOUT PREJUDICE.

CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Dkt. No. 88) is GRANTED IN PART and DENIED IN PART. The Alusas may proceed with the following causes of action:

1) the excessive force claim under § 1983 against Deputy Broos in her individual capacity;

2) the failure to train claim under § 1983 against Salt Lake County and Sheriff Winder in his official capacity;

3) the intentional torts claim against Deputy Broos in her individual capacity; and

4) the loss of consortium claim against Deputy Broos in her individual capacity.

The court DISMISSES WITH PREJUDICE the remaining claims against the Defendants.

The Defendants' Motions in Limine regarding expert testimony (Dkt. Nos. 86 & 95) are DENIED WITHOUT PREJUDICE. The Defendants' Motion in Limine regarding irrelevant subject matter (Dkt. No. 105) is GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART. The court excludes evidence concerning Mr. Mitchell's character because it finds that this evidence is irrelevant.

The court will set a trial schedule in this matter by separate order. The court also ORDERS the parties to submit to mediation within the next forty-five days.[6] The parties should file a status report informing the court of the outcome of those proceedings within seven days after the mediation occurs.

---

[6]The court will appoint a magistrate judge to serve as a mediator if necessary. The parties should file a request with the court if they wish the court to do so.

SO ORDERED this 1st day of August, 2013.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge